IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **BILLY PALMER,**<br><br>        **Plaintiff,**<br><br>v.<br><br>**JOHN R. TROST, JOHN COE,**<br>**GARY M. REAGAN, and DR. RITZ,**<br><br>        **Defendants.** | Case No. 3:19-CV-313-NJR |

# MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

This matter is before the Court on the motions for summary judgment on the issue of exhaustion of administrative remedies filed by Defendant Dr. Gary M. Reagan (Doc. 45), Defendant Dr. John R. Trost (Doc. 47), Defendant Dr. John Coe (Doc. 50), and Defendant Dr. Stephen Ritz (Doc. 53).[1] Dr. Reagan also has filed a Motion to Dismiss for Failure to State a Claim (Doc. 36). For the reasons set forth below, the motion for summary judgment on the issue of exhaustion of administrative remedies filed by Dr. Trost is granted, but the remaining motions are denied.

## BACKGROUND

Plaintiff Billy Palmer, a 65-year-old inmate of the Illinois Department of Corrections (IDOC), filed this action pursuant to 42 U.S.C. § 1983 for alleged deprivations of his constitutional rights. Specifically, Palmer claims Defendants were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment when they

---

[1] The Clerk of Court is **DIRECTED** to correct Dr. Ritz's name on the docket to Dr. Stephen Ritz.

failed to properly treat his prostate cancer (Doc. 1-2).

Palmer alleges that from January 2014 to December 2015, he had elevated prostate-specific antigen (PSA) levels on seven occasions (Doc. 1-2, p. 4; Doc. 1, p. 14). At that time, he was housed at Menard Correctional Center and was treated by Dr. Trost, who prescribed Flomax and Hytrin for his elevated PSA levels and enlarged prostate but ordered no additional diagnostic testing (Doc. 1-2 at p. 5).

On December 29, 2015, Palmer was transferred to Lawrence Correctional Center, where Dr. Ritz and Dr. Coe reviewed his medical chart regarding the need for an oncology consult. At that time, Dr. Ritz noted that Palmer had a history of elevated PSA and benign prostatic hyperplasia (BPH) but had not had a prostate biopsy and had not been diagnosed with prostate cancer (Doc. 1-2, pp. 5-6; Doc. 1-1, p. 25). Palmer alleges that Dr. Ritz, in conjunction with Dr. Coe, denied Palmer an oncology consultation and instead directed Lawrence Correctional Center to look through Palmer's medical records for a "rationale" for an oncology consultation (Doc. 1-2 at p. 6).

Palmer alleges that on February 25, 2016, Dr. Coe recorded in Palmer's medical records that, "after coming to Lawrence, I could find no proof of cancer and needed to see you first. You are now approved to see urologist for his opinion." (*Id.*). Dr. Coe then referred Palmer to Dr. Reagan, an outside provider at Crossroads Urology and Women's Health ("Crossroads") (Doc. 1-2, p. 6; Doc. 1, pp. 26, 27, 28).

On March 14, 2016, Palmer saw Dr. Reagan, who noted that Palmer had a two-year history of elevated PSA levels. Dr. Reagan recommended an ultrasound guided

prostate needle biopsy (*Id.*). Dr. Coe made the referral for the biopsy, which was approved and performed in April 2016 (Doc. 1-2, p. 8; Doc. 1, pp. 35, 37).

The needle biopsy indicated "prostatic adenocarcinoma," leading Dr. Reagan to order a whole-body nuclear medicine bone scan based on the diagnosis of primary malignant neoplasm of prostate (Doc. 1-2, p. 9; Doc. 1-1, p. 1). Dr. Coe made the referral for the whole-body scan and referred Palmer back to Dr. Reagan (Doc. 1-2, p. 9; Doc. 1-1, p. 7). In the rationale for the referral Dr. Coe stated, "He had been followed at Menard by Illinois Oncology LTD for suspected prostate CA since Jan 2014 and no one there even mentioned a prostate exam." (Doc. 1-2 at p. 9; Doc. 1-1 at p. 5).

After the bone scan, Dr. Coe again referred Palmer to Dr. Reagan, noting that Palmer "has prostate cancer and negative bone scan. He needs to consider therapy." (Doc. 1-2 at p. 9). Dr. Reagan saw Palmer on July 11, 2016, for a follow-up after the whole-body scan and chest x-rays, which did not show metastatic disease at that time (Doc. 1-1 at p. 8). Dr. Reagan recommended he have a repeat biopsy in one year but did not offer or provide any other treatment at that time (Doc. 1-2, p. 10; Doc. 1-1 p. 8).

Dr. Reagan again saw Palmer in December 2016, and Palmer expressed concern about his prostate cancer (Doc. 1-2, p. 11; Doc. 1-2 pp. 10-11). Dr. Reagan told Palmer it is common for men in his age group to have a small area of low-grade prostate cancer (Doc. 1-2, p. 11 ; Doc. 1-1 p. 12-15). They also discussed a repeat ultrasound biopsy as part of an observation protocol (*Id.*).

Palmer next saw Dr. Reagan in August 2017 after Dr. Ritz approved a request for a repeat needle biopsy (Doc. 1-2, p. 12; Doc. 1-1, p. 20). On September 18, 2017, after the

biopsy again showed adenocarcinoma, Dr. Reagan discussed various treatment options with Palmer, including another observation period, a radical prostatectomy, or radiation therapy (Doc. 1-2, p. 13; Doc. 1-1, pp. 29-30). Palmer decided on radiation therapy, which Dr. Reagan noted was a "reasonable decision." (*Id.*).

In October 2017, another doctor at Crossroads recommended a CT scan of Palmer's abdomen and pelvis, as well as a bone scan, to rule out metastatic disease (Doc. 1-2, p. 14; Doc. 1-1, p. 37). That doctor also indicated he would coordinate with Dr. Reagan regarding the PolyMark placement (*Id.*). On January 9, 2018, Palmer was taken to Crossroads for placement of the polymarker by Dr. Reagan (Doc. 1-1 at p. 39). Palmer alleges the polymarker placement did not go as planned, and he was rushed to Lawrence County Community Hospital for treatment (Doc. 1-2 at p. 15). Palmer learned his blood was infected by the improper placement of the polymarker (*Id.*).

In February 2018, Palmer began radiation therapy, which he tolerated well (Doc. 1-2, pp. 16-17). As of early 2019, however, Palmer continued to have blood in his urine and pain when he urinates (*Id.*). Palmer alleges that at no time before late 2017 did Dr. Reagan or any other doctor tell him that radiation was an option as opposed to "observation therapy" (Doc. 1-2 at p. 14). Had he known that radiation was an option in 2016, he would have immediately opted for radiation therapy instead of allowing a year and a half to pass before a second biopsy showed the cancer had spread to the right and left apex (*Id.*).

Palmer filed one grievance related to his prostate cancer treatment (Doc. 46-1). The grievance, filed on October 11, 2017, at Lawrence Correctional Center states:

> In July of 2016, the doctor's [sic] said I had cancer. Wexford Health care

> refused to start treatment for 15 months, and now the Cancer has grown. The doctor who diagnosis [sic] said that every old person Has small amounts of cancer in them. Therefore, since I am a prisoner I did not need cancer treatment. Now the cancer has spread and grown and become life threatening because of wexfords inaction in not seeking [a] second opinion. The cancer has caused me pain and suffering. I am in pain and health care really does not care. . . .

(*Id.*). Palmer also stated that he needed the Counselor to help him get his medical records in order to file for clemency and to be added to the deadline list for the law library (*Id.*). As relief, Palmer requested $1 million for pain and suffering and for Wexford refusing medical treatment for 15 months; information as to why his cancer had to grow and spread before treatment could start; and information as to why Wexford did not aggressively seek treatment in 2016 for his cancer diagnosis (*Id.*).

A counselor responded to Palmer's grievance on November 21, 2017, noting, in relevant part, that per the Healthcare Unit, "Offender Palmer has been seen & treated and continues to be seen & treated by licensed Illinois Physician within community standards of care." (*Id.*).

The Grievance Officer received Palmer's grievance on December 4, 2017 (Doc. 46-2). The Grievance Officer noted that Palmer "has had numerous visits to HCU and nurse sick call visits." (*Id.*). The Grievance Officer found that Palmer's medical treatment was not being neglected "at this time." (*Id.*). Accordingly, the Grievance Officer recommended the grievance be denied (*Id.*). The Chief Administrative Officer concurred with the Grievance Officer's recommendation on December 18, 2017 (*Id.*).

Palmer appealed the denial of his grievance to the Administrative Review Board (ARB), which received the appeal on January 4, 2018 (Doc. 46-4). Palmer also sent a letter

to the ARB as part of his appeal, stating that the Grievance Officer did not address his complaint about the delay in and denial of medical care for more than 15 months (Doc. 46-3). As a result, the cancer had now spread and caused him serious pain and other complications. Palmer complained that the Grievance Officer's response was non-responsive and failed to address the main issue of his grievance. (*Id.*).

The ARB responded to Palmer on January 16, 2018, stating: "Offenders grv fails to meet DR 504.810. No review. Also requests do not go on grv form. Simply write to appropriate staff/unit." (Doc. 46-4).

Palmer filed this lawsuit on March 15, 2019.

## DISCUSSION

### I.  Motion to Dismiss for Failure to State a Claim

The Court first addresses Dr. Reagan's motion to dismiss for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure (Doc. 37). Dr. Reagan argues that Palmer's claims against him should be dismissed because Palmer failed to allege any facts that would support a finding of deliberate indifference on the part of Dr. Reagan. He further argues that Palmer's claims against him are barred by the statute of limitations.

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) is meant to "test the sufficiency of the complaint, not to decide the merits" of the case. *Gibson v. City of Chi.*, 910 F.2d 1510, 1520 (7th Cir. 1990) (citation omitted). To survive a Rule 12(b)(6) motion to dismiss, the plaintiff only needs to allege enough facts to state a claim for relief that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A plaintiff

need not plead detailed factual allegations, but must provide "more than labels and conclusions, and a formulaic recitation of the elements." *Id.* For purposes of a motion to dismiss under Rule 12(b)(6), the Court must accept all well-pleaded facts as true and draw all possible inferences in favor of the plaintiff. *McReynolds v. Merrill Lynch & Co., Inc.*, 694 F.3d 873, 879 (7th Cir. 2012). Taken together, the factual allegations contained within a complaint must "raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly,* 550 U.S. at 555 (internal citations omitted).

### A. Failure to Adequately Plead Deliberate Indifference

To state a claim for deliberate indifference, a plaintiff must allege that (1) he suffered from an objectively serious medical condition; and (2) defendant was deliberately indifferent to a risk of serious harm from that condition. *Petties v. Carter*, 836 F.3d 722, 727 (7th Cir. 2016).

Dr. Reagan argues that Palmer has failed to allege facts stating a claim for deliberate indifference against Dr. Reagan. Instead, he argues, Palmer has only alleged facts that show Dr. Reagan worked to diagnose, monitor, and treat Palmer's medical condition. At best, Palmer's allegations show merely that he was unhappy with the course of treatment he received, which is not enough to state a claim for deliberate indifference.

The Court disagrees. As the Court noted in its threshold order permitting Palmer to proceed on his claim against Dr. Reagan (Doc. 11), Palmer alleges Dr. Reagan was deliberately indifferent to his serious medical need in July 2016 when he recommended

that Palmer receive another biopsy in one year but did not offer or provide treatment at that time. Palmer also alleges Dr. Reagan failed to properly advise him of the available treatment options for his prostate cancer. Palmer claims that Dr. Reagan's failure to advise him of treatment options other than "observation therapy" allowed his cancer to spread and placed him at a substantial risk of serious harm.

Assuming those allegations are true, as the Court must at this juncture, Palmer has sufficiently alleged that he suffered from an objectively serious medical condition—prostate cancer—and that Dr. Reagan was deliberately indifferent to a risk of serious harm by failing to treat Palmer's cancer sooner. Accordingly, Dr. Reagan's motion to dismiss for failure to state a claim will be denied on this basis.

B.   **Statute of Limitations**

Dr. Reagan also argues that Palmer's claims are barred by the statute of limitations. Section 1983 does not contain an express statute of limitations, so federal courts adopt the forum state's statute of limitations for personal injury claims. *Wilson v. Garcia*, 471 U.S. 261, 276, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985); *Ashafa v. City of Chicago*, 146 F.3d 459, 461 (7th Cir. 1998). In Illinois, the limitations period for § 1983 cases is two years. *Johnson v. Rivera*, 272 F.3d 519, 521 (7th Cir. 2001); *see* 735 ILL. COMP. STAT. 5/13-202. Furthermore, "a federal court relying on the Illinois statute of limitations in a § 1983 case must toll the limitations period while a prisoner completes the administrative grievance process." *Terry v. Spencer*, 888 F.3d 890, 894 (7th Cir. 2018).

Accrual of a claim, however, is governed by federal law. *Wilson v. Wexford Health Sources, Inc.*, 932 F.3d 513, 517–18 (7th Cir. 2019). And the Seventh Circuit has recognized

that "a section 1983 Eighth Amendment claim based on deliberate indifference in the delivery of medical care does not necessarily allege a single event or a series of events, but may describe an ongoing denial of care." *Wilson*, 932 F.3d at 517 (citing *Heard v. Sheahan*, 253 F.3d 316, 319 (7th Cir. 2001)). That ongoing denial of care constitutes a continuing violation for accrual purposes. *Id.* "The alleged wrong—the refusal to provide medical care—'continue[s] for as long as the defendants [have] the power to do something about [the plaintiff's] condition.'" *Id.* (quoting *Heard*, 253 F.3d at 318).

In this case, Dr. Reagan argues that he was not responsible for Palmer's continuous care and supervision, but rather only saw Palmer on a handful of occasions. Furthermore, the only appointment where Palmer claims Dr. Reagan was deliberately indifferent occurred on July 11, 2016. And the latest date that Dr. Reagan saw Palmer while he was still on the "observation protocol" was in December 2016. Because his interactions with Palmer were discrete and individualized, Dr. Reagan argues that the continuing violation doctrine does not apply, and Palmer was required to file his lawsuit by December 2018 at the absolute latest. Because Palmer did not file until March 2019, his claims against Dr. Reagan are time-barred.

Again, the Court disagrees. Palmer asserts that Dr. Reagan failed to advise him of the available treatment options for his prostate cancer in July 2016, and that he did not become aware of those options until at least September 2017. *See Wilson v. Giesen*, 956 F.2d 738, 740 (7th Cir. 1992) (civil rights claims accrue when the plaintiff knows or should have known his constitutional rights have been violated). Thus, regardless of the continuing violation doctrine, the Court finds that Palmer had at least until August 2019 to file suit.

Furthermore, the statute of limitations was tolled while Palmer completed the grievance process. *Terry*, 888 F.3d at 894. Palmer filed his grievance on October 11, 2017, and the process was not complete until the ARB responded to his appeal on January 18, 2018.

Given that Palmer did not become aware of the alleged violation of his constitutional rights until August 2017 and the statute of limitations was tolled during the grievance process, the Court finds that Palmer's March 2019 lawsuit was timely filed and Dr. Reagan's motion to dismiss based on the statute of limitations must be denied.

## II.   Motions for Summary Judgment on Exhaustion of Administrative Remedies

Each Defendant has filed a motion for summary judgment arguing that Palmer's claims must be dismissed against them because Palmer failed to exhaust his administrative remedies before filing this lawsuit.

Summary judgment is proper if the pleadings, discovery materials, disclosures, and affidavits demonstrate no genuine issue of material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). Lawsuits filed by inmates are governed by the provisions of the Prison Litigation Reform Act ("PLRA"). 42 U.S.C. § 1997e(a). That statute states, in pertinent part, that "no action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." *Id.* The Seventh Circuit requires strict adherence to the PLRA's exhaustion requirement. *Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006). Exhaustion must occur before the suit is filed. *Ford v. Johnson*, 362 F.3d 395, 398 (7th Cir. 2004).

"To exhaust remedies, a prisoner must file complaints and appeals in the place, and at the time, the prison administrative rules require." *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002). Consequently, if a prisoner fails to properly utilize a prison's grievance process, "the prison administrative authority can refuse to hear the case, and the prisoner's claim can be indefinitely unexhausted." *Dole*, 438 F.3d at 809. Under *Pavey v. Conley*, "debatable factual issues relating to the defense of failure to exhaust administrative remedies" are not required to be decided by a jury but are to be determined by the judge. *Pavey v. Conley*, 544 F.3d 739, 740-41 (7th Cir. 2008). Because there are no disputed issues of fact, the Court finds that no evidentiary hearing is required in this case.

*Illinois Administrative Code*

The grievance procedure for inmates of the IDOC is laid out in the Illinois Administrative Code. 20 ILL. ADMIN. CODE § 504.800, *et seq*. If the inmate's grievance does not involve an emergency, the inmate must first file a grievance with the counselor within 60 days of the discovery of an incident. *Id.* § 504.810(a). The grievance form must contain factual details regarding what happened, when, where, and the name of each person who involved in the complaint. *Id.* at 504.810(c). While this provision does not preclude an offender from filing a grievance when the names of individuals are not known, he or she must include as much descriptive information about the person as possible. *Id.*

Grievances that are unable to be resolved through the counselor are then sent to the Grievance Officer. *Id.* at § 504.820(a). "The Grievance Officer shall consider the grievance and report his or her findings and recommendations in writing to the Chief

Administrative Officer within two months after receipt of the grievance, when reasonably feasible under the circumstances." *Id.* at § 504.830(e). The Chief Administrative Officer then reviews the findings and recommendation of the Grievance Officer and advises the offender of his or her decision in writing. *Id.*

If the inmate is not satisfied with the response from the Chief Administrative Officer, he or she can file an appeal the decision to the Administrative Review Board. *Id.* at § 504.850(a). The appeal must be received by the ARB within 30 days after the date of the CAO's decision. *Id.* The ARB then must submit to the Director a written report of its findings and recommendations. *Id.* at § 504.850(d). "The Director shall review the findings and recommendations of the Board and make a final determination of the grievance within 6 months after receipt of the appealed grievance, when reasonably feasible under the circumstances." *Id.* at § 504.850(e).

Defendants do not dispute that Palmer submitted a grievance on October 11, 2017, regarding treatment of his prostate cancer, that the counselor, Grievance Officer, and CAO responded to the grievance, and that Palmer appealed the CAO's denial of his grievance to the ARB. Defendant Dr. Reagan argues, however, that the appeal was insufficient because the ARB returned it to Palmer, noting his submission did not meet the requirements of DR 504.810 and, thus, no review was conducted.

But the ARB did not explain *how* Palmer's submission did not meet the requirements of DR 804.810 and, in fact, it appears that Palmer *did* comply with the rule requirements. Palmer filed a timely grievance, received all the required institutional responses, and then timely appealed the denial of his grievance to the ARB. Why the ARB

Page 12 of 16

did not review the grievance is unknown, and Palmer should not have been left to guess how to appropriately appeal the denial of his grievance. The ARB's statement that he should "simply write to appropriate staff/unit"—presumably regarding his request for medical records and to be added to the law library list—is completely unresponsive to his complaint regarding his medical care. And an administrative remedy "becomes 'unavailable' if prison employees do not respond to a properly filed grievance or otherwise use affirmative misconduct to prevent a prisoner from exhausting." *Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006) (citing *Lewis v. Washington*, 300 F.3d 829, 833 (7th Cir. 2002)). For those reasons, the Court finds that Palmer's October 11, 2017 grievance served to exhaust his administrative remedies.

Defendants next argue that Palmer's grievance was insufficient to exhaust his specific claims against each defendant individually because he did not name them or provide information that would put the prison on notice of the issue.

The Illinois Administrative Code sets forth what information must be included in a grievance:

> The grievance shall contain factual details regarding each aspect of the offender's complaint, including what happened, when, where, and the name of each person who is the subject of or who is otherwise involved in the complaint. This provision does not preclude an offender from filing a grievance when the names of individuals are not known, but the offender must include as much descriptive information about the individual as possible.

20 ILL. ADMIN. CODE § 504.810(b).

The Seventh Circuit has recognized, however, that while the Illinois Administrative Code now requires the name or a description of the persons involved in

the complaint, the "Department of Corrections has been slow to make that requirement explicit on the forms it gives inmates." *Conley v. Anglin*, 513 F. App'x 598, 601 (7th Cir. 2013) ("We have held that when a prisoner uses a grievance form asking only for a 'Brief Summary of Grievance,' . . . then the omission of names or identifying information does not necessarily mean that the prisoner failed to exhaust his administrative remedies so long as he otherwise followed the grievance process."). Thus, when a prisoner uses a grievance form that only asks for a "Brief Summary of Grievance," the Court of Appeals has held that the omission of names or identifying information is not dispositive of the issue. *Id.*; *Maddox v. Love*, 655 F.3d 709 (7th Cir. 2011).

Here, the form used by Palmer only asks for a "Brief Summary of Grievance." (Doc. 46-1). It did not instruct Palmer to set forth the name of each person involved or to provide identifying information. (*Id.*). Even so, Palmer's grievance clearly identifies those who he believes are responsible for the untreated growth of his cancer—the doctors and Wexford Health Sources, Inc. Prison officials clearly knew what doctors had treated Palmer, for on November 21, 2017, the counselor responded: "Per HCUA Cunningham, 'As documented in medical chart Offender Palmer has been seen & treated & continues to be seen & treated by licensed Illinois Physician within community standards of care.'" (Doc. 46-1). And Palmer's medical chart from October and November 2017 references Dr. Reagan, Dr. Coe, and Dr. Ritz, the latter two being Wexford employees. Moreover, Dr. Reagan was the doctor who diagnosed Palmer with cancer and who initially decided on an observation protocol. While he did not explicitly name Dr. Reagan, Palmer obviously was referring to him.

Dr. Ritz also argues that the timing of the grievance was too late to grieve any complaints Palmer had against him. Dr. Ritz asserts Palmer is only suing him for his deliberate indifference from January 2014 to December 29, 2015, while Palmer was at Menard Correctional Center. Yet, Palmer did not file a grievance until October 2017, well after he left Menard.

Upon further review, the Court does not read Palmer's complaint so narrowly.[2] Palmer alleges that Dr. Ritz, in consultation with Dr. Coe, denied him an oncology consultation in January 2016. Palmer further alleges that Dr. Ritz had subjective knowledge of his elevated PSA levels, yet refused to provide any type of treatment to determine whether he had cancer. It was not until September 2017 that Palmer discovered his cancer had spread to both the right and left apex and that other treatment options were available but not offered to him. He then filed his grievance a month later. Accordingly, the Court finds that summary judgment is not proper as to Dr. Ritz.

The same cannot be said for Dr. Trost. Palmer's allegations against Dr. Trost stem from his treatment of Palmer at Menard from January 2014 until December 29, 2015, when Palmer transferred to Lawrence. Palmer never wrote a grievance complaining about Dr. Trost's treatment while he was housed at Menard, and his October 11, 2017 grievance does not mention Dr. Trost or Menard. Thus, the Court finds that summary judgment should be granted to Dr. Trost.

---

[2] In the Court's preliminary review of Palmer's Complaint pursuant to 28 U.S.C. § 1915A, Palmer's claims were divided into two counts, and his claims against Dr. Ritz were limited to the time period from January 2014 to December 2015. The Complaint, however, references actions taken by Dr. Ritz after December 2015.

## Conclusion

For these reasons, the Motion to Dismiss for Failure to State a Claim (Doc. 36) and the Motion for Summary Judgment on the Issue of Exhaustion of Administrative Remedies (Doc. 45) filed by Dr. Gary M. Reagan are **DENIED**.

The Motion for Summary Judgment on the Issue of Exhaustion of Administrative Remedies filed by Dr. John Coe (Doc. 50) is **DENIED**.

The Motion for Summary Judgment on the Issue of Exhaustion of Administrative Remedies filed by Dr. Stephen Ritz (Doc. 53) is **DENIED**.

The Motion for Summary Judgment on the Issue of Exhaustion of Administrative Remedies filed by Dr. John Trost (Doc. 47) is **GRANTED**. Plaintiff's claims against Dr. Trost are **DISMISSED without prejudice**.

**IT IS SO ORDERED.**

DATED:   July 27, 2020

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**