IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| BILLY PALMER, #A10002, <br><br> Plaintiff, <br><br> v. <br><br> JOHN COE, GARY M. REAGAN, and STEPHEN RITZ, <br><br> Defendants. | Case No. 19-cv-00313-SPM |

# MEMORANDUM AND ORDER

**MCGLYNN, District Judge:**

Plaintiff Billy Palmer, an inmate in the Illinois Department of Corrections, filed this action under 42 U.S.C. § 1983 for alleged deprivations of his constitutional rights. (Doc. 1).[1] Palmer claims that while housed at Menard Correctional Center and Lawrence Correctional Center Defendants acted with deliberately indifferent to his serious medical needs in violation of the Eighth Amendment when they failed to properly treat his prostate cancer.

Pending before the Court is a Motion for Summary Judgment filed by Defendant Coe and Ritz (Doc. 101), and a Motion for Summary Judgment filed by Defendant Reagan (Doc. 103). On December 30, 2021, Palmer filed responses in opposition to both motions. (Doc. 110, 111). On January 13, 2022, Defendants Ritz and Coe filed a reply brief. (Doc. 112). Now that this matter has been fully briefed, and for the reasons set forth below, the Court grants both motions for summary judgment.

---

[1] Palmer commenced this action as a pro se litigant, but he is now represented by counsel. Attorney Thomas Pliura entered an appearance on behalf of Palmer on January 7, 2020. (Doc. 69).

## RELEVANT FACTS

The parties do not dispute the following facts. On October 1, 2013, Palmer was sent to see an outside oncologist, Dr. Visconti. (Doc. 102-1, p. 2). At the time, Palmer was fifty-eight years old and an inmate at Menard Correctional Center ("Menard"). Dr. Visconti diagnosed Palmer with an elevated prostate-specific antigen ("PSA") level and recommended that Palmer return in three months for a follow-up appointment. (*Id.* at p. 3-4).

Palmer continued seeing Dr. Visconti while housed at Menard. In 2014, he had appointments on January 7, May 27, September 5, and December 16. (Doc. 102-1, p. 8, 11, 14, 16). Palmer was seen again by Dr. Visconti on April 14, 2015. (*Id.* at p. 22). From January 2014 through April 2015, his PSA levels were documented as follows: 7 on January 3, 2014, 7.5 on April 18, 2014, 6.9 on August 18, 2014, 6.1 on January 16, 2015, and 6.8 on April 10, 2015.[2] (*Id.* at p. 6, 9, 12, 17, 20).

On May 26, 2015, Palmer received an MRI of his spine that showed no metastasic disease to the lumbar spine. (Doc. 102-1, p. 24-25; Doc. 1, p. 18). On June 2, 2015, Palmer's PSA level was recorded at 7.7. (Doc. 102-1, p. 26). His PSA level in September of 2015 is unclear. Dr. Duncan's medical records indicate that Palmer's PSA level was 6.9 on September 2, 2015 (Doc. 111-1, p. 35, 39, 43, 47, 51, 61), but a lab report included in Palmer's exhibits record his PSA as 3.1 on September 25, 2015. (*Id.* at p. 17).

During the time periods relevant to this case, Defendant Dr. Stephen Ritz was the Corporate Utilization Management Medical Director for Wexford Health Sources, Inc. (Doc. 102-2, p. 2). Part of his duties were to provide collegial review services for the inmates within IDOC, including

---

[2] The lab report documents Palmer's PSA level as 6.8 on April 10, 2015. (Doc. 102-1, p. 20). However, when documenting Palmer's medical history, Dr. Duncan records that Palmer's PSA level for April 10, 2015 was 7.2. (Doc. 111-1, p. 35, 39, 43, 47, 51, 61).

Palmer. As a collegial review physician, Dr. Ritz did not treat inmates onsite at the correctional facilities. (*See* Doc. 110, p. 5). Rather, he would review offsite referral recommendations presented by the onsite doctor and then approve or deny the recommendation. (*Id.*) (citing *Howell v. Wexford Health Sources, Inc.,* 987 F. 3d 647, 651 (7th Cir. 2021)).

Dr. Ritz became involved in Palmer's care when he first approved a request presented in collegial review for Palmer to receive a follow-up oncology appointment with Dr. Visconti on November 14, 2014. (Doc. 102-1, p. 15). Prior to this date, Palmer's referrals had been referred to and approved in collegial review by other physicians. (Doc. 102-2, p. 3). Dr. Ritz approved further appointments with Dr. Visconti on March 12, 2015, and April 23, 2015. (Doc. 102-1, p. 19, 23; Doc. 102-2, p. 4). On May 7, 2015, Dr. Ritz approved the request for Palmer to receive an MRI of his spine. (Doc. 102-1, p. 24; Doc. 102-2, p. 4). Dr. Ritz also approved oncology appointments on May 28, 2015, and July 16, 2015. (Doc. 102-1, p. 25, 28, 29; Doc. 102-2, p. 4).

Palmer's last appointment with Dr. Visconti was on October 6, 2015. (Doc. 102-1, p. 29, 30). At this appointment, Dr. Visconti recommended for Palmer to "continue Proscar 5 mg at bedtime." (*Id.*). It is not exactly clear when Palmer began taking the Proscar medication.[3]

Palmer was then transferred to Lawrence Correctional Center ("Lawrence") on December 29, 2015. (Doc. 102-1, p. 31). At this time, Palmer's diagnosis was benign prostatic hyperplasia ("BPH") with elevated PSA. (Doc. 102-1, p. 31; Doc. 102-3, p. 3). His medications included Proscar. (*Id.*).

After Palmer's transfer, Defendant Dr. John Coe, the Medical Director at Lawrence, reviewed Palmer's medical records and requested for Palmer to receive an oncology follow-up through the collegial review process. (Doc. 102-3, p. 3). Dr. Ritz deferred the request so that

---

[3] Dr. Duncan's records that Palmer had been taking "Proscar since September 2016." (Doc. 111-1, p. 35).

Palmer could first be examined by Dr. Coe. (Doc. 102-1, p. 33; Doc. 102-2, p. 4; Doc. 102-3, p. 3). Palmer was initially scheduled for the medical doctor call line on January 25, 2016, but a prison lockdown prevented him from being seen.

On February 1, 2016, Palmer saw a physician assistant at Lawrence. (Doc. 102-1, p. 34). The physician assistant recommended that Palmer have a follow up in three months and receive a rectal exam. Dr. Coe examined Palmer for the first time two weeks later on February 15, 2016. (*Id.* at p. 35). At the appointment, Dr. Coe recorded that Palmer reported symptoms of slow urination stream and nocturia for more than two years but that his symptoms had improved. (Doc. 102-1, p. 35; Doc. 102-3, p. 4). Dr. Coe performed a digital exam and identified four knots, 2 mm in size, on Palmer's prostate. Dr. Coe recorded that his prostate was not enlarged for his age-group. Dr. Coe then resubmitted Palmer for collegial review and requested that Palmer see a urologist. (*Id.*). Dr. Ritz approved the request. (Doc. 102-1, p. 36; Doc. 102-2, p. 5).

Palmer saw Defendant Dr. Gary Reagan, a urologist, on March 14, 2016. (Doc. 102-1, p. 38; Doc. 104-5, p. 1). Based on Palmer's elevated PSA's, Dr. Reagan recommended Palmer have an ultrasound guided prostate needle biopsy. (Doc. 102-1, p. 38-39; Doc. 102-2, p. 5; Doc. 104-5, p. 1). Dr. Coe then submitted a request to collegial review for the procedure. (Doc. 102-3, p. 4). On March 22, 2016, Dr. Ritz approved the request. (Doc. 102-1, p. 41; Doc. 102-2, p. 5). Dr. Reagan performed the prostate needle biopsy on April 19, 2016. (Doc. 102-1, p. 43; Doc. 104-5, p. 2). The biopsy revealed prostate cancer in one biopsy specimen, a "low grade 6 prostatic adenocarcinoma." (Doc. 104-5, p. 2).

On May 4, 2016, Dr. Coe reviewed the results. (Doc. 102-3, p. 4). Dr. Coe submitted Palmer for a metastasis "work-up," which included a bone scan and chest x-ray. (Doc. 102-1, p. 46, 48; Doc. 102-3, p. 4). Dr. Ritz then approved the request for a bone scan and a follow-up

appointment with Dr. Reagan. (Doc. 102-2, p. 5). The results of the x-ray were normal, with no evidence of metastasis. The bone scan was also negative for metastasis. (Doc. 102-3, p. 5).

At an appointment with Dr. Reagan on July 11, 2016, Dr. Reagan confirmed Palmer had no evidence of metastatic disease. (Doc. 102-3, p. 5; Doc. 104-5, p. 2). Dr. Reagan's recommended treatment plan was for Palmer to continue taking the Proscar medication, observation therapy, and a repeat biopsy in one year. (Doc. 102-1, p. 51-52; Doc. 102-3, p. 5; Doc. 104-5, p. 2).

On July 13, 2016, Dr. Coe reviewed Dr. Regan's note and concurred with his recommendation of "watchful waiting" of Palmer's prostate cancer. (Doc. 102-3, p. 5). Dr. Coe documented that Palmer would need a referral to Dr. Regan the following spring, confirmed that Palmer would be seen in the chronic clinic for his prostate cancer, and recorded that Palmer should continue taking Proscar. (Doc. 102-1, p. 54; Doc. 102-3, p. 5). This was the last time Dr. Coe treated Palmer, as Dr. Coe was no longer the Medical Director of Lawrence after August 2, 2016. (Doc. 102-3, p. 5.).

Dr. Ritz continued to approve requests for Palmer to have follow-up appointments with Dr. Reagan. (Doc. 102-2, p. 5). Palmer met with Dr. Reagan on December 5, 2016. (Doc. 102-1, p. 55-58). At the appointment, Dr. Reagan explained to Palmer the commonality of his low-grade prostate cancer in men of Palmer's age group. (Doc. 104-5, p. 3). Palmer saw Dr. Reagan again on April 17, 2017. Palmer did not report experiencing any new symptoms. (Doc. 102-1, p. 62; Doc. 104-5, p. 3; ). Dr. Reagan endorsed his course of observation protocol and recommended that Palmer receive a repeat prostate biopsy to be sure Palmer could continue on the observation protocol. (*Id.*). Dr. Ritz approved the request for the procedure. (Doc. 102-2, p. 6).

Palmer had a repeat prostate needle guided biopsy on August 15, 2017. He then had a follow-up appointment with Dr. Reagan to discuss his results on September 18, 2017. (Doc. 102-

1, p. 65; Doc. 104-5, p. 4). Dr. Reagan explained that the low grade 6 carcinoma had spread to both his right and left apex and that the total amount of cancer was less than 10%. (Doc. 104-5, p. 4). A Palmer agreed to radiation therapy. Dr. Reagan placed an order with Lawrence for Palmer to undergo an ultrasound-guided prostate marker placement. (*Id.*). This was the last time Dr. Reagan treated and saw Palmer.

Dr. Ritz approved for Palmer to have an appointment with a radiation-oncology, Dr. Duncan. (Doc. 102-2, p. 6). An additional bone scan and CT scan both rendered negative results for metastatic disease. Palmer received a polymark placement on November 17, 2017, and began radiation therapy on February 1, 2018. Dr. Duncan discontinued the Proscar medication "forever." (Doc. 102-1, p. 70; Doc. 111-1, p. 36, 40, 44, 52, 55, 56). Palmer continued to receive radiation therapy until April 19, 2018. (Doc. 102-2, p. 6).

In August, September, October, and December of 2018, Dr. Ritz continued to approve Palmer for outside specialist appointments. (Doc. 102-2, p. 6). On July 18, 2019, a physician at Lawrence recorded in Palmer's medical records that his cancer was in remission. (Doc. 102-1, p. 87).

## LEGAL STANDARDS

### I. Summary Judgment Standard

Federal Rule of Civil Procedure 56 governs motions for summary judgment. "Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law.'" *Anderson v. Donahoe*, 699 F.3d 989, 994 (7th Cir. 2012) (quoting FED. R. CIV. P. 56(a)). *Accord Archdiocese of Milwaukee v. Doe,* 743 F.3d 1101, 1105 (7th Cir. 2014). A genuine issue of material fact remains "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). *Accord Bunn v. Khoury Enterpr., Inc.*, 753 F.3d 676, 681-82 (7th Cir. 2014).

In assessing a summary judgment motion, the district court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party. *Anderson*, 699 F.3d at 994; *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011). As the Seventh Circuit has explained, as required by Rule 56(a), "we set forth the facts by examining the evidence in the light reasonably most favorable to the non-moving party, giving [him] the benefit of reasonable, favorable inferences and resolving conflicts in the evidence in [his] favor." *Spaine v. Cmty. Contacts, Inc.*, 756 F.3d 542, 544 (7th Cir. 2014).

## II. Eighth Amendment Deliberate Indifference

The Eighth Amendment prohibits cruel and unusual punishment and deliberate indifference to the "serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution." *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 828 (7th Cir. 2009) (citation omitted). A prisoner is entitled to "reasonable measures to meet a substantial risk of serious harm"—not to demand specific care. *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997).

In order to prevail on a claim of deliberate indifference, a prisoner who brings an Eighth Amendment challenge of constitutionally-deficient medical care must satisfy a two-part test. *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011). The first consideration is whether the prisoner has an "objectively serious medical condition." *Id*. *Accord Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). "A medical condition is objectively serious if a physician has diagnosed it as requiring treatment, or the need for treatment would be obvious to a layperson." *Hammond v. Rector*, 123 F. Supp. 3d 1076, 1084 (S.D. Ill. 2015) (quoting *Pyles v. Fahim*, 771 F.3d 403, 409

(7th Cir. 2014)). It is not necessary for such a medical condition to "be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). *Accord Farmer v. Brennan*, 511 U.S. 825, 828 (1994) (violating the Eighth Amendment requires "deliberate indifference to a *substantial* risk of serious harm") (internal quotation marks omitted) (emphasis added).

The second consideration requires a prisoner to show that a prison official has subjective knowledge of—and then disregards—an excessive risk to inmate health. *Id*. at 653. A plaintiff need not show the individual "literally ignored" his complaint, but that the individual was aware of the condition and either knowingly or recklessly disregarded it. *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008). "Something more than negligence or even malpractice is required" to prove deliberate indifference. *Pyles*, 771 F.3d at 409. Deliberate indifference involves "intentional or reckless conduct, not mere negligence." *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010) (citing *Gayton*, 593 F.3d at 620).

Assessing the subjective prong is more difficult in cases alleging inadequate care as opposed to a lack of care. Without more, a "mistake in professional judgment cannot be deliberate indifference." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016). The Seventh Circuit has explained:

> By definition a treatment decision that's based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment. A doctor who claims to have exercised professional judgment is effectively asserting that he lacked a sufficiently culpable mental state, and if no reasonable jury could discredit that claim, the doctor is entitled to summary judgment.

*Id*. (quoting *Zaya v. Sood*, 836 F.3d 800, 805-06 (7th Cir. 2016)). This is in contrast to a case "where evidence exists that the defendant[ ] knew better than to make the medical decision[ ] that

[he] did[.]" *Id.* (quoting *Petties v. Carter*, 836 F.3d 722, 731 (7th Cir. 2016)) (alterations in original). Additionally, a medical professional's choice of an easier, less efficacious treatment can also rise to the level of violating the Eighth Amendment where the treatment is known to be ineffective but is chosen anyway. *Berry,* 604 F.3d at 441.

### ANALYSIS

#### I. Deliberate Indifference Claim Against Dr. Reagan

Palmer claims that after receiving a confirmed prostate cancer diagnosis, Dr. Reagan's decision to employ "observation therapy" and continuing to prescribe Proscar from March 2016 through August 2017 amounts to deliberate indifference. (Doc. 111). Because he had been diagnosed with cancer, his risk was obvious. Yet, Dr. Reagan chose to "do nothing" for 16 months. The only treatment provided during this time was the prescription Proscar (finasteride). A medication that is not a treatment for prostate cancer and can actually mask the hallmark symptom of prostate cancer, an elevated PSA. (*Id.* at p. 9) (citing study by the NIH National Cancer Institute, Doc. 111-2). Dr. Reagan documented in the medical records at his first appointment with Palmer on March 14, 2016:

> The fact that his PSA decreased in half when he was started on Proscar is a normal response to the Proscar medication rather than indicating anything regarding the possibility of prostate cancer.

(Doc. 102-1, p. 40). Thus, Dr. Reagan was aware that Proscar could lower PSA levels without treating the cancer but only offers a "vague assertion that this medication was somehow a treatment for cancer" as an explanation for his decision. (Doc. 111, p. 6). Dr. Duncan also notated in the medical record the effect Proscar can have on PSA levels. He documented that Palmer's PSA was recorded as 6.9, but it was most likely closer to 14 "due to suppression with Proscar." (Doc. 102-5, p. 31). Palmer points out that no other witness has made a claim that Proscar is a treatment for

prostate cancer.

Palmer also argues that Dr. Reagan's treatment plan did not follow guidelines issued by the National Comprehensive Cancer Network, which were referenced and followed by Dr. Duncan, or a study issued by the NIH National Cancer Institute. Under "watch and wait," Palmer continued to have symptoms, his PSA remained elevated, and his cancer spread. Thus, Palmer argues that a jury can reasonably find that the decision to do nothing to treat Palmer's prostate cancer was not an exercise of sound clinical judgment and constituted deliberate indifference. (Doc. 111, p. 8).

The Court finds that Palmer has not raised a genuine issue of fact as to whether Dr. Reagan acted with deliberate indifference when treating his prostate cancer. Upon examining Palmer, Dr. Reagan states in his declaration that he determined a "guided prostate needle biopsy was medically indicated due to [Palmer's] elevated PSAs." (Doc. 104-5, p. 2). The biopsy revealed that Palmer had "low grade 6 prostatic adenocarcinoma." (*Id.*). Dr. Reagan then conducted additional testing and determined that the disease had not metastasized. (*Id.*; Doc. 102-1, p. 52). In the medical record, Dr. Reagan records informing Palmer that "it is very common in his age group to have a small area of low-grade prostate cancer." (*Id.* at p. 52, 58). Because Proscar is "somewhat protective" regarding prostate cancer and Palmer had a "low grade non-metastatic tumor," Dr. Reagan determined that observation therapy and continuation of Proscar was medically indicated. He states in his declaration that in July 2016 his treatment decision was not a substantial departure from accepted medical judgment and was standard urology therapy for Palmer's "low burden of prostate tumor." Radiation therapy was not medically indicated nor necessary at that time.

Palmer has not offered any expert testimony refuting Dr. Reagan's treatment decisions and the evidence provided is insufficient to support an inference that he acted with the necessary

culpable state of mind. Palmer argues that an expert is not needed because the jury could infer Dr. Reagan was aware of an obvious risk to his health since he had been diagnosed with cancer but disregarded that risk by choosing not to provide treatment. While it is true that an expert witness is not always needed to demonstrate deliberate indifference, that is not the case here, where Dr. Reagan's "decision was not so obviously wrong that a layperson could draw the required inference about [his] state of mind without expert testimony." *Whiting,* 839 F. 3d, at 662. As discussed above, when a defendant doctor claims he exercised his professional judgment, evidence must be presented that would allow a reasonable juror to discredit that claim. *See Whiting,* 839 F. 3d at 662. The evidence in this case does not even show a mistake in professional judgment, let alone deliberate indifference.

As evidence, Palmer points to Dr. Duncan's treatment recommendation of radiation, which he claims runs counter to Dr. Reagan's treatment of observational therapy. The Court disagrees. Dr. Duncan did not examine Palmer until October 2017, and there is nothing in the record to indicate that Dr. Duncan disagreed with the observation therapy treatment decision made by Dr. Reagan in July 2016, a year earlier, when the cancer was contained to the left apex and considered "very common in his age group." (Doc. 102-1, p. 58). Furthermore, the medical record shows that in the fall of 2017, after the cancer had spread, Dr. Reagan and Dr. Duncan proceeded in a similar manner. After receiving the results from the second biopsy, on September 18, 2017, Dr. Reagan discussed with Palmer different treatment options, including observation therapy, radical prostatectomy, and radiation therapy. (Doc. 104-5, p. 4). Palmer was in favor of radiation therapy, and so, Dr. Reagan placed an order with Lawrence for Palmer to undergo an ultrasound-guided prostate marker placement. (*Id.*). Palmer was then referred to Dr. Duncan, who, like Dr. Reagan, discussed treatment options with Palmer, *including* "active surveillance in men with life

expectancy at least 10 years." (Doc. 102-5, p. 31). After reviewing all of the options, Palmer again elected to proceed with definitive radiotherapy. Thus, there is no evidence that Dr. Reagan's recommended treatment plan in July 2016 ran counter to Dr. Duncan's recommendations in October 2017.

The study by the NIH National Cancer Institute also does not show that Dr. Reagan failed to use sound clinical judgment in recommending observational therapy. (*See* Doc. 111-2, p. 1-3).The study discusses the use of Proscar in decreasing the risk of low-grade prostate cancer in men 55 years of age and older. The study describes low-grade cancers as "those with a Gleason score of 6 or less – which present little health risk but, nonetheless, are often treated with radical surgery or radiation." (*Id.* at p. 2). The fact that low-grade cancers, such as Palmer's, are "often" treated with radiation or surgery does not show that Dr. Reagan departed from accepted medical practices when making the determination that radiation therapy was not medically indicated in July 2016 or that no minimally competent professional would have recommended observational therapy. Rather, it shows that there is a difference of opinion between doctors in treating cancers that present "little health risk." *See Zaya,* 836 F. 3d at 803 ("[i]t is well established that a difference of opinion between two doctors is insufficient to survive summary judgment"). Again, a difference in opinions does not rise to the level of deliberate indifference.

Palmer also contends that Dr. Reagan's treatment decision is not in accordance with guidelines issued by the National Comprehensive Cancer Network, the NCCN Clinical Practice Guidelines in Oncology for Prostate Cancer ("NCCN Guidelines"). [4] Palmer argues that NCCN Guidelines "call for active surveillance in patients with very low risk prostate cancer and life expectancy of less than 20 years; neither of which applied to Plaintiff." (Doc. 111, p. 9-10). Thus,

---

[4] Palmer cites to an article discussing the NCCN Guidelines and a corresponding medical study but did not provide a copy of the NCCN Guidelines themselves.

observational therapy was not an appropriate treatment plan for him.

Based on the article and study provided by Palmer discussing the NCCN Guidelines, he has incorrectly restated the recommendations. The article explains that the NCCN clinical guidelines recommend that "[o]nly active surveillance should be offered and recommended for men with very low-risk prostate cancer when life expectancy is less than 20 years." *NCCN Updates Prostate Cancer Management Guidance,* THE "NEW" PROSTATE CANCER INFOLINK (posted January 7, 2010), https://prostatecancerinfolink.net/2010/01/07/nccn-updates-prostate-cancer-management-guidance/.[5] The study provides that the "NCCN Guidelines indicate active surveillance to be a standard option for all men with very-low-risk prostate cancer, and the only option for men with very-low-risk prostate cancer and an expected survival of less than 20 years." Ayal A. Aizer et al., *Models of Care and NCCN Guideline Adherence in Very-Law Risk Prostate Caner,* 11 OFFICIAL J. OF THE NAT'L COMPREHENSIVE CANCER NETWORK (Nov. 2013), https://jnccn.org/view/journals/jnccn/11/11/article-p1364.xml.[6] Based on these two sources, the guidelines referenced do not address treatment recommendations for prostate cancer patients who do not fit the criteria specified (very-low-risk prostate cancer and expected survival of less than 20 years). Neither do the NCCN Guidelines discussed state explicitly or implicitly that active surveillance is not appropriate for other types of patients. Thus, the NCCN Guidelines reference by Palmer do not demonstrate that Dr. Reagan was not exercising professional judgment or acting contrary to accepted medical practices when implementing observational therapy.

If anything, the article cited supports Dr. Reagan's medical determination. In discussing the NCCN Guidelines, which were implemented in 2010, the article emphasizes that "active surveillance is not 'no treatment,'" contrary to Palmer's argument. The article goes on to say:

---

[5] Last visited March 25, 2022.
[6] Last visited March 28, 2022.

> Active surveillance is defined as a "deferred treatment" strategy, whereby the patient and his doctor set out to give necessary treatment only if and when it is needed. The intent is to be able to offer curative therapy to patients who need curative therapy before the disease spreads but to avoid over-treatment of patients who are likely to have greater risk of harm than benefit from immediate curative treatment. And in the case of many patients this means that treatment may be deferred indefinitely or even forever.
>
> According to James L. Mohler, MD, of Roswell Park Cancer Institute, who is the current chair of the NCCN Guidelines Panel for Prostate Cancer, "The NCCN Prostate Cancer Guideline Panel and the NCCN Prostate Cancer Early Detection Panel remain concerned about over-diagnosis and over-treatment of prostate cancer. Growing evidence suggests that over-treatment of prostate cancer commits too many men to side effects that outweigh a very small risk of prostate cancer death."
>
> Although the NCCN Guidelines Panel stresses the importance of considering active surveillance, ultimately this decision must be based on careful individualized weighting of a number of factors including life expectancy, disease characteristics, general health condition, potential side effects of treatment, and patient preference," notes Dr. Mohler. "It is an option that needs to be thoroughly discussed with the patient and all of his physicians which may include his urologist, radiation oncologist, medical oncologist, and primary care physician."

*NCCN Updates Prostate Cancer Management Guidance*, THE "NEW" PROSTATE CANCER INFOLINK. Accordingly, Dr. Reagan is entitled to deference, and the studies and article do not show Dr. Reagan disregarded a risk to Palmer's health by proceeding with observational therapy.

Palmer also argues that a jury could find that Dr. Reagan's belief that Proscar was a treatment for prostate cancer has no basis in fact. Palmer argues that an elevated PSA level is a "hallmark symptom of prostate cancer." (Doc. 111, p. 6). Dr. Reagan knew that Proscar "masked" PSA levels but prescribed the medicine anyways, hindering Palmer's ability to obtain effective treatment. Again, Palmer has not offered any evidence to support these arguments. The NIH National Cancer Institute study cited examines the use of Proscar (finasteride) in decreasing the risk of low-grade prostate cancer. The results of the study found that the men taking "finasteride had a 30 percent decrease in the relative risk of developing prostate cancer compared with men

who took a placebo." (Doc. 111-2, p. 2). The study does not address or speak to the use of finasteride as a form of treatment by men who have already been diagnosed with cancer. Accordingly, it does not serve to contradict Dr. Reagan's determination that Proscar can be "somewhat protective regarding [Palmer's] prostate cancer." (Doc. 104-5, p. 2).

Neither does Dr. Duncan's decision to discontinue prescribing Proscar during radiation therapy in October 2017 demonstrate deliberate indifference on the part of Dr. Reagan, who decided to continue prescribing Proscar in July 2016, while Palmer was on observational therapy. (*See* Doc. 111-1, p. 44). It is clear from the medical records and scholarly sources cited by Palmer that other factors, not solely PSA levels, are considered when diagnosing and treating prostate cancer.[7] Dr. Reagan was aware that Proscar would influence Palmer's PSA levels but still made the medical determination to prescribe the medicine because he believed it to be "somewhat protective." Other than his own conclusory statement, Palmer has failed to produce any evidence showing that this treatment decision was so plainly inappropriate as to permit the inference that Dr. Reagan intentionally or recklessly disregarded his medical needs by prescribing Proscar.

Because Palmer has not presented any evidence showing that Dr. Reagan's decision to treat him with observational therapy and Proscar was "so far afield of accepted professional standards as to raise the inference that is was not actually based on a medical judgment," *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006), the motion for summary judgment as to Dr. Reagan is granted.

## II. Deliberate Indifference Claim Against Dr. Ritz and Dr. Coe

Palmer first argues that Dr. Ritz acted with deliberate indifference by persisting in a course

---

[7] *See* Dr. Duncan's medical records referencing Palmer's age, cancer diagnosis, stage, Gleason score, PSA level, life expectancy, and risks associated with different treatments. (Doc. 111-1, p. 62). *See also* the "NCCN Updates Prostate Cancer Management Guidance" article quoting the chair of NCCN Guidelines Panel for Prostate Cancer regarding active surveillance, "ultimately this decision must be based on careful individualized weighting of a number of factors including life expectancy, disease characteristics, general health condition, potential side effects of treatment, and patient preference." *NCCN Updates Prostate Cancer Management Guidance*, THE "NEW" PROSTATE CANCER INFOLINK.

of treatment known to be ineffective by continuing to refer Palmer to the wrong specialist. (Doc. 110). From November 12, 2014 through July 16, 2015, Dr. Ritz authorized five referrals to Dr. Visconti, an oncologist, "when Palmer clearly had a urological problem" and needed a biopsy. During this time, Palmer contends his condition did not improve, and the treatment provided by Dr. Visconti was "ineffectual." Palmer's PSA levels stayed around 7, and his symptoms persisted. Yet, Dr. Ritz continued to refer Palmer to Dr. Visconti. The repeated referrals delayed Palmer from receiving a biopsy, resultant diagnosis, and a Gleason score. Palmer argues that a jury could reasonably find that Dr. Ritz's persistent referrals to the wrong specialist delayed him from receiving proper care from a urologist.

Palmer next argues that Dr. Coe and Dr. Ritz acted with deliberate indifference by repeatedly authorizing follow-up appointments with Dr. Reagan, who deferred treating Palmer's prostate cancer for sixteen months, other than prescribing Proscar. Palmer argues Dr. Reagan's "watch and wait" approach was "inarguably ineffective." He states that Dr. Coe and Dr. Ritz have not presented any evidence, outside their own assertion, that deferring treatment was a sound exercise of clinical judgment. Therefore, a jury could also find that the decision to do nothing to treat Palmer's confirmed cancer for over a year amounted to deliberate indifference.

Given the absence of evidence presented by Palmer, the Court finds that no reasonable jury could conclude that Dr. Ritz acted with deliberate indifference. First, there is no evidence to support the argument that Palmer was referred to the "wrong" specialist. Palmer has not presented any expert testimony showing that the decision to refer Palmer to an oncologist was "a substantial departure from accepted medical judgment," *Whiting*, 839 F. 3d at 663, and again, the referral to one specialist over another is not so obviously wrong that expert testimony is not needed. This is demonstrated by the record, as other medical doctors also referred Palmer to an oncologist for

treatment.

Prior to Dr. Ritz's involvement in Palmer's treatment, at least three other doctors either recommended or approved treatment of Palmer's condition by Dr. Visconti.[8] At Palmer's last appointment with Dr. Visconti on October 6, 2015, it appears it was Dr. Visconti's intention to continue treating Palmer, as he recommended a return visit in January 2016. (Doc. 102-1, p. 30). Once Palmer was transferred to Lawrence, Dr. Coe also determined that a follow-up visit with Dr. Visconti was appropriate and submitted the request to collegial review. Finally, the article cited by Palmer discussing the NCCN Guidelines state that a prostate cancer patient's treating physician may include a "medical oncologist." *NCCN Updates Prostate Cancer Management Guidance,* THE "NEW" PROSTATE CANCER INFOLINK. Thus, Palmer has not presented any evidence that Dr. Ritz acted with deliberate indifference, and the Court defers to his professional judgment to continue referring Palmer to Dr. Visconti for treatment of his elevated PSA and BPH. *See Whiting,* 839 F. 3d at 663.

There is also no evidence to support the argument that Dr. Coe and Dr. Ritz acted with deliberate indifference in authorizing referrals to and treatment by Dr. Reagan. Since Palmer's arrival at Lawrence in December 2015, both doctors were actively engaged in his health care. Within his first two months at Lawrence, Dr. Coe and Dr. Ritz had reviewed Palmer's case in collegial review, Dr. Coe physically examined Palmer, and the decision was made to refer Palmer to a urologist, Dr. Reagan, rather than to continue his appointments with Dr. Visconti. Dr. Coe then requested that Palmer receive a biopsy, additional testing to ensure the disease had not metastasized, and follow-up appointments with Dr. Reagan. Dr. Ritz approved all of these

---

[8] On September 12, 2013, Dr. Shearing requested for Palmer to be referred to Dr. Visconti. The request was approved by Dr. Garcia. (Doc. 102-1, p. 2). A request for a follow-up appointment with Dr. Visconti was later approved by Dr. Fisher on December 6, 2013. (*Id.* at p. 5). Another doctor, Dr. Trost, also submitted Palmer's case to Dr. Ritz for collegial requesting a follow-up appointment with Dr. Visconti. (*Id.* at p. 15).

requests. After Dr. Coe ceased employment at Lawrence, Dr. Ritz continued to review Palmer's medical records and approved three additional follow-up appointments to Dr. Reagan, the request for a second biopsy, and then a referral to Dr. Duncan for radiation therapy.

Palmer's claim against Dr. Coe and Dr. Ritz is based on his disagreement with Dr. Reagan's treatment decisions. As discussed above, there is no evidence to support his contention that "no physician exercising sound medical judgment would have ever" implemented a treatment protocol of observational therapy for 16 months, as well as prescribe Proscar. (*See* Doc. 110, p. 7). Because the Court finds that no reasonable jury could find that Dr. Reagan failed to exercise professional judgment, the Court also finds that Dr. Coe and Dr. Ritz did not act with deliberate indifference in authorizing Dr. Reagan's treatment plan of "watchful waiting" and approving referrals to Dr. Reagan from March 2016 through September 2017. *See Roe v. Elyea,* 631 F. 3d 843, 857 (7th Cir. 2011) ("[a] medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have so responded under those circumstances." (quoting *Sain v. Wood,* 512 F. 3d 886, 894-95 (7th Cir. 2008))). The record demonstrates Dr. Coe and Dr. Ritz were regularly reviewing Palmer's medical information, examining him, and referring him for offsite care and additional testing. It was not deliberate indifference to concur with Dr. Reagan's recommendations. Accordingly, the motion for summary judgment is granted as to Dr. Ritz and Dr. Coe.

### III. Current Condition- Request to Defer Ruling

Palmer has included an updated affidavit attached to his response stating that since 2021 he has been experiencing significant back pain and was overdue for repeat PSA testing. (Doc. 110-3). Based on conversations with Dr. Duncan and other medical providers, back pain is "often a sign of bony metastasis from prostate cancer." (Doc. 110, p. 11; Doc. 110-3, p. 1). At some point

he had an x-ray taken and was told he would be scheduled for an MRI. Blood tests were conducted on December 8, 2021, and at the time of filing his responses to the motions for summary judgment, Palmer was "possibly approved for an MRI." Palmer speculates that his cancer may have returned and metastasized.

Palmer asks the Court, pursuant to Federal Rule of Civil Procedure 56(d), to defer consideration of the motions for summary judgment until the results of his recent test results are known. Palmer argues that Defendants make the claim that he received "curative treatment" from Dr. Duncan, but this assertion cannot be confirmed until the test results are produced.

The request is denied. The Court finds that Dr. Reagan, Dr. Ritz, and Dr. Coe did not act with deliberate indifference in treating Palmer's prostate cancer during their involvement in his medical care from 2014 through 2018. Thus, the Court does not need to address whether "substantial harm" resulted from their conduct, and an update on Palmer's condition and current treatment is not necessary for ruling on the summary judgment motions.

## DISPOSITION

For the reasons stated above, the Court **GRANTS** the Motion for Summary Judgment filed by Defendants Coe and Ritz. (Doc. 101). The Court also **GRANTS** the Motion for Summary Judgment filed by Defendant Reagan. (Doc. 103).

Accordingly, this case is **DISMISSED with prejudice**. The Clerk of Court is **DIRECTED** to enter judgment in favor of Defendants Coe, Ritz, and Reagan and against Plaintiff Palmer and to close this case.

**IT IS SO ORDERED.**

**DATED:   March 28, 2022**

　　　　　　　　　　　　　　　　　　　　　　　　_s/Stephen P. McGlynn_
　　　　　　　　　　　　　　　　　　　　　　　　**STEPHEN P. MCGLYNN**
　　　　　　　　　　　　　　　　　　　　　　　　**United States District Judge**